We have pleased the court. How many times have you argued in the Fifth Circuit? A couple. A couple? A couple. A couple more than a couple? You know, it's an honor to be here. It really is. And it's, not to be patronizing, but it's impressive to listen to all the different kinds of cases you all listen to. It's, I imagine, pretty difficult. We're happy to have both of you here today to help us. Thank you. Thank you, sir. I appreciate that. I want to first pass on my best regards for my client, K.S., who can't be here today. You know, this case started in 2010 when he was 11 years old. He's 17 now. He's a senior at the Evangelical Christian School here in Shreveport, Louisiana. What name? Come again, please? What name of the school? The Evangelical Christian School. Evangelical. Evangelical School. You know, if you go back and look at the record, you kind of think, well, where would this kid be six or seven years from now? And you look at the record, you'd say, God, he'd probably be in the juvenile detention center. He'd be in residential treatment. He'd be in a suicide, maybe. Well, he's president of the class. He's going to college next year. He's going to get some scholarships. And the relevance of that is that environment is important for children. Environment is important for children. And what this case is about is about children. It's about their environment. And, of course, it's about summary judgment. And it's about a number of other issues that we're going to talk about. But I wanted to get that in because his mom really wanted you to know that he's doing well. In regard to one of the legal issues at hand is whether the magistrate committed plain error, and by extension so did the district judge, by failing to follow certain jurisprudence. And we believe that the magistrate absolutely committed plain error by failing to follow the requisites of Davis v. Monroe in regard to the elements of a Title IX claim. And then in addition... Can you say why objections weren't filed? Does the record tell us that? I can tell you why. I didn't want to give the district judge the opportunity to clean it up. What about this... This is a much harder case. You know, it's interesting. I went back and looked at it, and I know it's one of those... I consider it maybe a distinction without a difference, to be very honest with you. I mean, I kind of looked at case law. I tried to find out what's really the difference between a de novo review on a motion for summary judgment versus this plain error rule. And I would say in this case, I think we can support the plain error rule, because as we go through, hopefully you'll get a chance to talk about it, and the record will speak to it, of course, is that I believe the magistrate totally missed the boat on a couple of the elements that are real clear in Davis v. Monroe. More importantly, in a more recent case regarding summary judgment, he absolutely missed the boat in regard to summary judgment standards. He weighed the evidence. He gave deference to the defendant's comments and facts rather than to the ones by the plaintiffs. And any and all inferences that could have occurred and been inured to the benefit of the plaintiff went to that of the defendant. So I would say, based upon my understanding of what a plain error would be, I believe that we satisfy that criteria, Your Honor. Where do you accept, though, that that's what we are applying? Is that you agree that plain error is what we need to apply? Unfortunately, yes. Okay. I mean, I think you're right, but I just want to make sure you agree with that. The hardest one, I think, for you on the plain error is the deliberate indifference. Because our case law says deliberate indifference is not shown by the fact that the remedial steps are ineffective. And so can you help us overcome how that's plain error? I think there's a couple pieces to that. Once again, going back to Davis, we're looking at the constellation of facts. And Lance, the court, told us to look at all the various parts of the record. So in telling the story, and, of course, when you hire a lawyer, you're really just hiring a storyteller. So I'm here to tell their story. So we have this child. We know that he's being assaulted physically to have sexual connotations. No one seems to argue that. There's a question that the magistrate brings up about that the school's not on notice, which I thought was his first major error, because there's significant testimony in there. And the reason I bring that up is because I think his error there shows that his failure in other areas as well. So the kid's being bullied and harassed daily. He's having his breasts touched daily. He's having his nipples twisted. He's being called faggot, being called gay, all at the same time. He's being harassed on the bus. He's being harassed in the gym. He's being harassed in the locker room. He's being harassed. Racial also. There's some racial issues there, but I never thought there was enough for a Title VI claim, just to be frank. Okay. That goes to the hostile educational environment, of course, but it doesn't create a separate cause of action, in my estimation. So we kind of go through the elements. And the magistrate erred when he said that there wasn't enough notice, that the school wasn't on notice, that he was being bullied and harassed for sexual harassment purposes. Well, the student, they had the incident on the bus, everyone knew about. They had the incident in the locker room, everyone knew about. The child went to the secretary of the principal almost daily and left notes. During two particular incidents that he was questioned under deposition, and in his own declaration he brought up incidents where he told the vice principal that he was being bullied, harassed, and touched on his breasts and chest. And, in fact, he said a singular incident that made him go home and commit suicide was because he told the principal that he was being touched on his chest and nobody did anything again and again and again.  So that's the first area, the magistrate's area, and I think it's brutal because it sheds light on how he did not weigh the evidence, not only there, now more particularly on the deliberate indifference issue. The deliberate indifference issue is kind of interesting because if you go back to Davis, well, let me go back to Gebser. Gebser says that the plaintiffs argued in Gebser that the school district didn't have policies and procedures in place to deal with the abuse by the teacher. And the court said, rightfully so, says, listen, not having the policies and procedures in place by themselves don't create a cause of action. That doesn't get you past deliberate indifference. Fair enough. In Davis, the Supreme Court specifically cited the various standards that are set forth in the regulations, and they specifically cited the Office of Civil Rights directives on Title IX dealing with bullying and harassment and student-on-student harassment that do create, not causes, you know, let's say a per se violation, I'll use that term, that creates deliberate indifference, but part of these elements, part of these things you're supposed to look at to determine whether or not a school has acted correctly. One of the reasons I was interested in this case, and we admit it, is that it's not that the school didn't do anything. It's really a question of their effectiveness. And there was a case that was before you recently, Your Honor. Thank you. Go ahead. And I don't want to speed past something. No, go ahead. But to me, when we get to a deliberate indifference discussion, Yes, sir. I mean, I think it's undisputed that the school took some action. So now we're talking about whether or not the action they took was effective. Correct. Which is a different question, apparently, from whether or not they had noticed that there was harassment and all of this other misbehavior about fellow students. Because I think they had noticed. But what would you have the school do that they didn't do in this case? What should they have done? There's a litany of standards that are set forth by the Office of Civil Rights, and they're basically procedural due process protection for parents. They get notice of their rights. They get notice of the investigation. They have a right to get a report. Our client, Ms. Sanders, never got any investigatory reports. They have a right to know who the Title IX coordinator is. She never got that. They have a right to be able to know they can file a grievance with the school board. She never got that right. They have a right to know that they can file a complaint with the Office of Civil Rights. She never got those rights. So it's procedural rights that we believe have substantive effect. So she should have received notice of her procedural rights. Absolutely. In some detail. But are those guidelines binding on the district? Are those guidelines binding on the district, or are those just one way that the district could handle? I think the answer is both. They're both binding, but it is one way, meaning it's not the only way, and certainly they don't have to follow that to be able to satisfy other things. Do they have to follow that A, B, C, D, E, F, G, and if they miss one, they lose? Of course not. Where does it say they're binding rather than just one? Well, I would go back to what Davis says. I think, by reference, the standards set forth in the Code of Federal Regulations, and it clearly speaks to specifically Office of Civil Rights directive that the school district was on notice to. And then the important thing is that they're also incorporated into the school district's own policies and procedures, which they proudly present. So what is it the school should have done? Very good question. I was impressed by a recent case, Kelly v. Allen ISD. I think, in fact, before you were on the panel, Judge Elrod. And one of the things that the school district did there for that young man who was being bullied and harassed, among many things, but what impressed me the most was that they referred him to the Fellowship for Christian Athletes to be able to be part of a group and a team. In other words, they did something to incorporate him to a group to kind of separate his isolation and make him part of the whole. They also did something. Referred him to the Fellowship of Christian Athletes. Yes, at that school. In that particular case, you asked me what I think the school did that was good. In other words, they. . . You can imagine that there could be some schools or some parents who may have a problem with being referred to the Fellowship of Christian Athletes. You can envision that that could be. I'm Jewish. I mean, everybody has lots of things. All right. That's why we're all here. All right. But the point is they had an option. Yeah, the point is they had an option. All right. I'm not sure if there's any fellowship. All right. Tell me something else. But anyway, even more important and relevant, I thought also, because there's case law that goes along with this, is that they referred the young man to a social skills group. In other words, they understood that he was having problems relating to his environment, and they referred him to a social skills group. Now, one of the things also that's important in the deliberate indifference review of kids like my client is the literature absolutely reflects that because these kids have social skills problems, when they're bullied and harassed, they're more apt to get in trouble for defending themselves. Using the athletic viewpoint again, you know, the guy that commits the foul first gets away with it, and the one that retaliates, they're the ones that get penalized by the referee. Well, that's what happened to my client. He was punished. All the time. For, as you allege, him fighting back after somebody did something to him. Exactly right. And what's interesting in the school district's own training programs, and they list elements of things that you're supposed to be careful about and look for in a kid that's being bullied or harassed, is guess what? They fight back, and they're the ones that get in trouble. So did the school district do anything to address that issue? The answer is no. Well, they did do some things, though. What is your best case for not doing the right things or not doing enough things is deliberate indifference as opposed to? Well, I think the case I just cited, the Kelly case, the Fennell case, they talked about different things that the school district should do. I mean, the real issue is, Your Honor, implicit in your question is who makes that decision. That's where we get to the issue of Cotton versus Tolan. In other words, we understand, and the magistrate believed that the school district did enough. Fine. Of course, we don't think they did. But that's a fact question, and that fact question should go to a jury. It shouldn't be decided by a magistrate. And as a matter of course, I think that this court knows, certainly my good friend Mr. Brandt knows, because he and I are on the same case together, this Rideau versus Keller ISD case, which has been before and probably before you again, is it's the only case that's gone to trial on a school-based injury in Texas and the Fifth Circuit and maybe in the country. The only case. What does that tell us? That tells us that cases, it tells us what the Supreme Court said in Tolan, that cases, district courts are, I don't know, misusing, using too much summary proceedings. Here there's a question, a material question of fact, about whether the school district's interventions were effective. They provided something. Granted. They investigated. True. They did some punishment. Did they provide psychological service to the child? No. Did they provide social skills training to the child? No. Did they provide- So you're listing these as examples of where they were not effective. Really, if that's the label you think is appropriate, it seems to me that the case law says we're not looking at effectiveness. We're looking at deliberate indifference. You may be right on what they should have done. Do you have some other label for it or do you disagree that effectiveness really isn't our standard? Effectiveness, let me use another term that's used and maybe this is part of when you give us, you know, decision or wisdom on this issue is to help articulate some of these things. Decision or wisdom? Yeah. Won't be both probably. But the other term is that you see in the case law is the failure to remedy. So a good example would be you stop, the school district stops the child from being bullied and harassed. There's no more sexual assaults. But they don't fix the effects of the harassment, which we have alleged in our complaint and in our brief as well. So I think that's also why they were deliberately indifferent because they did not affect any of the remedies they could have to deal with the abuse and harassment the child experienced. Not just stopping it, but remedying its effects. Thank you. Thank you. May it please the Court, Counsel. In the opening statement by Mr. Sakeel, he talked about the effectiveness. That was the central issue, and he also was asked by Judge Southwick about that and said the other word he would use was failure to remedy. That answers the case. That answers the question that disposes of this case. First of all, we've got, you start in the Davis line of cases, student-on-student harassment, first of all. You start there, and you say that standard is very difficult to meet in the best of cases. It's just very difficult to meet. That's the law. Then you go to, we had summary judgment evidence, and it was applied properly. The proper standard was applied, and then there were no objections. Now we have the plain evidence review, the plain error rule. Again, very difficult standard to overturn the district court final judgment. Counsel, it seems to me that from reading the briefs and obviously Mr. Sakeel's argument this morning, you seem like there are two different set of facts here. One is the set of facts that the magistrate judge said were relevant, which were the 13 incidents reported to the school and to which responses were done. And then there's a whole day-by-day set of facts in which he was being harassed. There is in the briefing, it was mentioned again today, that he was daily taking some note down to somebody's principal's office or whatever. What about that? How does the case law deal with that? It does seem to me that we are looking at summary judgment now. There is some evidence in the record that his problems at the school, the incident at the school, are much more than these 13. How do we deal with that under the case law as well as the school? If the school was fully aware of some incident that principal, assistant principal, whoever, saw, but he didn't then come in and report, how does that fit into the case law? Yes. The way that it fits in is, first of all, you go down to the granular level and you go to the depositions and you go to what we found out. What we found out through the deposition process of K.S. I took his deposition. I took his mother's and his grandfather's. Those were the three people who were involved. Through those three depositions, we determined that there were only 13 reported incidents. Then I cross-examined each one of those individuals, including K.S., and in that process got him to admit that other than those 13, there were no other reported. Nothing else was reported to anyone at the school district. That was the way we make the distinction between these statements that K.S. makes later in a declaration after his deposition was taken. He makes a declaration that it was happening every day. These global assertions of fact saying it was happening every day, that's the way we distinguish it. Well, I thought you were saying the 13 were just those he reported, principal, somebody else. Are you saying there is no testimony to support that there was a much wider set of events than those 13? There was testimony in a declaration filed after the deposition. After we'd already cross-examined K.S., he says he gives a declaration, which we objected to. The magistrate said he's going to let it in and consider it. So, yes, there was testimony on that point. But the real point is to say not only was it going on, if you accept that as a fact issue, the question is who knew about it. What we have is 13 incidents that we knew about, the record reflects that we knew about, and it talks about we go through tediously and laboriously and say what did we do with each one of those 13? How were they resolved? But for him to say just generally everyone knew or this was happening every day is what he said. This was happening every day. He doesn't tie it to any individual who knew and then didn't do anything in response, but also he doesn't tie it to gender or gender stereotyping as well. There's no tie to that. Was the principal deposed, make, in some way, evidence from that person or teachers? I mean, was there any effort by Mr. Sirkeel, by the plaintiff, to generate evidence that this was more widely known than these 13? As I recall, there were — there was a — Gwen McCormick was deposed. I think there were only four depositions. I took three. I took the student, the mother, and the grandfather. Those were the three who were involved with the school, had interaction with the school. And I believe Mr. Sirkeel took Ms. McCormick's deposition. But other than that, I don't think — Who was that? Ms. McCormick, I believe, and you'll correct me if I'm wrong, I think that was — that was one of the administrators. I don't remember exactly. The one at that school that — Yes. Yes. So she testified. And we also have the affidavits from the individuals that we've submitted into evidence in the summary judgment. They were available for deposition but not deposed. But anyway, we have that issue about deliberate indifference. I think that is absolutely key. So we've got the Davis standard, we've got the plain error standard, and now we've got the deliberate indifference standard. And what you've got is a pattern of responses. And when you say, well, when Mr. Sirkeel says, well, you know, there were a lot of situations here, and he kept — he used the basketball analogy of somebody fouling first and retaliation getting in. Well, what we don't do, what this court should not do, is to second-guess disciplinary decisions of a school district such that when we go — when we drill down and we explain what we were doing in this particular instance, some of those incidents, like the bus incident, we disciplined the other students. We didn't discipline him. He was harassed on the school bus, and we took action against the students who bothered him. There were other instances where it was determined by the administrators that he was the initiator, that he was the one who was doing the inappropriate conduct, whether at the pep rally using foul language or whether instituting some kind of an action against someone. That was drilled down by the administrators to look at it and say, what happened here? And they determined in some circumstances that K.S. was at fault. Now, to then step back and ignore those actual facts and to say, well, you've got this big picture here of a lot of problems that this boy is having at Tidwell Middle School, therefore the light bulb should have gone off over your head that he's been bullied, that's a very inappropriate leap of logic. It is inappropriate because the OCR suggests that there are firm proactive steps where a strategy is not working, that you can take more proactive, there's certain, if the school learns of the problem and the step, things it's not doing, or things it's doing are not working, OCR would say you need to try these other proactive things. That's right. They would. And OCR says a great deal of things. So I'm wondering, are you not bound by that? No. No. So we shouldn't look to the fact that you're not using best practices, assuming the argument, no, that you're not. Yes. You're correct, Judge Elrod, because if you assume best practices is the standard, then you've assumed a negligent standard. It is a deliberate indifference standard. Let me point out as well, OCR is not, the OCR letters, dear colleague letters, are letters, okay, and they are not binding on the Davis standard. The Supreme Court set the standard, OCR doesn't set the standard. What OCR can do, and you have to understand there are two remedies, there are two remedies in this kind of area. One is to pull funding, and the other is to have an implied right of cause of action, which Davis says. If OCR, if the Federal Government wants to pull our funding, it can use those best practices as an argument to do so. But it's not appropriate to use those, quote, best practices, import them over, and make them a replacement for the deliberate indifference standard. If the strategy you're using is not working with the kid and he's still getting harassed? I don't want to be flippant in my response. I think there may be something out of the Ninth Circuit, who knows, but I am not aware of any. I'm not aware of any. Does our circuit say to the contrary? Yes, absolutely, absolutely, yes. This circuit has said that repeatedly. Okay. Well, then I have a factual question. Yes. Is it true that the record says that the psychologist helper person was calling the school and trying to talk to the principal or the assistant principal and was pushed off so that they couldn't report things or give suggestions for how to help him? That is not correct. That's in the brief, but I was searching for the record for it. You're talking about Annie Wally. The record reflects that there were calls made from Annie Wally, who is a therapist, private and private practice, and the evidence was that we called her back and she never called us back again. So we made efforts, and that's in the record, that we made efforts to respond to Annie Wally to find out what she had to say, and the way I see the record and the evidence in the record was that Annie Wally dropped the ball. We didn't chase her down. We didn't, you know, repeatedly hound her, but that's the way the record reflects. She contacted us. We tried to contact her back, and then nothing ever happened. There was no further contact. You know, you only need one of these to win, but I want to, you know, you establish no deliberate indifference, but I'm concerned about what the magistrate judge said about the concrete negative effect. It looks like the standard was too robust for that, because it seems that there is evidence that he had at least suicidal tendencies at some point and had a lot of absences, and I would think that under any reasonable standard that that would be some evidence that it had a negative impact and that, therefore, the court could be wrong under plain error in its analysis of that particular aspect of the case. Do you have a comment on that? Yes, I do, and that has to do with the body of law on plain error, and what it says is that this court has the discretion to correct plain errors only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. We do prong four every day of the week in sentencing cases. You know that. And we have discretion. So you're saying you would ask us not to use our discretion to correct. I'm asking, though, about the court erred in this respect in prong one and two, didn't it? I don't think so, Your Honor. Well, then tell me why. I think the prong one and two of the deliberate indifference analysis. No, I'm talking about on the prong one and two of plain error on the concrete negative effect part of the case. Here's why. The court can err on that and you can still win the case, but it appears that that part is a wrong analysis. Well, Your Honor, what I would say is the way I viewed the entire body of response on that point was we looked at what his grades were, we looked at what we were able to achieve through him, and his academic progress continued through that, and that's in the record. We had him. He finished all of his coursework, and so. But attempted suicide is a concrete negative effect. If he's having to miss school, because even if he does get good grades anyway and he's really smart, it's having a negative effect on his educational thing that he's not able to go to school and he's having. Even if he's a genius and can make good grades anyway. Well, what you have is only the bald assertion, conclusory assertion, that this situation at school was the cause of my desire to commit suicide. That's it. There's nothing in the record. And what we have here is a child who was being attended to on a regular basis, was responded to on a regular basis, and the fact that he had this negative experience in his life is not tied to something that the administration did in being deliberately indifferent to him. Okay. Why wouldn't three incidents of multiple people grabbing your breast be the exact type of gender stereotyping that would be serious and pervasive? Why did the court, that's another area of possible error, that the court determined it wasn't pervasive and serious because it's breast grabbing and it's on a male, but it's through a gender stereotyping and it's multiple people grabbing the breast at the same time. Okay. Now, we have to make sure we're focused on who the gender stereotyping is, who is engaged in this alleged gender stereotyping. This is like Bow Brothers. It's the people that the other students are saying he's feminine. Okay. But the fact that children are teasing each other, pinching each other, twisting each other, that is not the issue. The issue is, is the gender stereotyping going on in the response by the administration to a report of that? So what happened was, on the bus, there was an incident of the breast grabbing. There's three incidents of the breast grabbing, aren't there? Well, I'm aware of the one on the bus. That one is one I'm – there may have been others. And I thought there's another one somewhere, I thought. Okay. Assuming there's three, the still – the gender stereotyping issue has to be from the school to the student in response to say, oh, you're a boy, therefore they're grabbing your breast. I'm not going to come down as hard as if they grabbed a girl's breast. Well, it sounded like that from the magistrate judge's report that they're saying it's – and it's just the breast. And that seemed to be an inappropriate assumption, that grabbing your breast if you're a male repeatedly is okay. But perhaps – Well, to the extent that that is a gloss that the magistrate was putting on it – You're not adopting – you're not advocating that. No, I'm not advocating that. What I'm saying is that there is zero evidence in the record to suggest that the administration – they don't care as much because it's a boy being grabbed by the breast, and if it had been a girl, we'd come down hard. There's no evidence in the record to suggest that at all. There's some argument that's made, but zero evidence on that point. And that's the gender discrimination or gender stereotyping. But you're not advocating that it's not serious because it's a boy. No, but it is – it had to be – but we have to have notice of the severe pervasiveness of it. Well, three times multiple people would be pervasive in some way. But remember, we responded to each one of them. And I don't have them all committed to memory. The one that was most clear was the one on the bus. And all the people who were participating in harassing K.S. on the bus were disciplined. That was appropriate action that they admit was appropriate. Right. That goes to deliberate indifference. It doesn't go on whether he was subjected to pervasive harassment. Right. And the court finds that he wasn't subjected to pervasive harassment, and that's somewhat questionable. And it seems that the easier way to decide this case, and it seems that you tend to agree with that, is the deliberate indifference part of the case. Well, that's right. I mean, in the effort to represent my client and secure an affirmation of the final judgment, yes, my stronger argument is the deliberate indifference. So I'm willing to— Well, tell me, can you explain why it would not be severe and pervasive to have your breast grabbed three times by multiple people, assuming, arguendo, that the record says that? Well, let me back up a second, because in the record it's not the grabbing of the breast that caused the suicide. In fact, the allegation is that it was a response of a comment, an offhand comment, about don't go crying to your mama from a coach. It's the whole thing. It's the— Well, anyway, but I don't think that the—perhaps it is. Perhaps you look at it as a whole piece of cloth, and there's interwoven parts to it. But I'm not going to stand here and say that that is a good thing to grab anyone. But the fact of the matter is, on the playgrounds in schools, these kind of things happen, and all that is really required is to have a response, an appropriate response to them all. And if it happens again, you respond again. But it is only if we were to have not responded at all or said, you know what, tough, grow up, it's a tough world out there, get used to it, that's the deliberate indifference. And there was none of that. There was none of that in this case. With that, if there are no other questions, I will close just by saying I ask that you, based on this record, affirm the judgment in favor of Northwest ISD. Thank you for your time. Thank you. Just in this issue of the 13 reports that they did respond to, Mother's declaration testimony is very, very specific. When she was questioned about this in deposition and then later in the declaration stated, the idea that there are only 13 complaints made is absolutely false. Her testimony is clear. She went to the school weekly. They got tired of seeing her. The principal, Conklin, she reported, would like run away. Didn't want to talk to her. She testified in her declaration that she told the counselor that her son was being groped. She told the school vice principal her son was being groped. One comment that she specifically made that I think is relevant to where we are today is she said specifically, I forget if it was to the principal, Conklin, or the vice principal, McCormick, that if this was a girl, you wouldn't treat her like this, which really subsumes the idea that she obviously made complaints about her son being bullied and harassed and groped physically. So the idea that there's no evidence about these other allegations of him being sexually harassed is not true. Now, that goes to the deliberate indifference issue, because they didn't investigate any of those. They investigated the ones they wanted to investigate. And the ones they wanted to investigate are all, except for the first one, they're all disciplinary actions against the student. So to say that there were remedial measures to help him deal with bullying and harassment and say those reports somehow helped them, well, okay, they did something. But they certainly didn't do anything to remedy any of the experience he was having. Well, you're saying they took disciplinary action against the students who perpetrated the acts against him? No, I'm not aware of that. They only took disciplinary action against him when they investigated the incident. Now, that's my understanding. Maybe other parts in the record that would show otherwise. So I don't want to say that. But what I am saying is that regardless, he became the center of the problem. I thought there were some instances where they took disciplinary action against the perpetrators. I would assume they did, particularly at the beginning. But I think that goes to the issue of, you know, here we are from September to December. Going back to Davis, it was a four-month period that the court looked at there, too. So in the four months, what did they do? Yeah, they penalized some kids at the beginning. And you ask some cases. They're in our brief, of course. The Sixth Circuit case was Patterson v. Hudson Schools, 551 F. 3rd, 438, Sixth Circuit. And Vance v. Spencer County Public Schools, 231 F. 3rd, 253, also Sixth Circuit. And those deal with this remedial issue. They specifically say not only do schools have to stop the harassment, but also the common sense idea is that they also need to deal with the effects. I mean, if a child's being ---- So you're saying they should have referred him to counseling, psychiatric treatment, something like that? Exactly. Exactly. Did he eventually get some psychiatric treatment? Yes, he did. But his mother sought that out. Yes. And, in fact, another point that I need to bring up, Your Honor, is that while there was some discussion between the school attempting to get in touch with the school counselor and they missed each other, fair enough, in December the school counselor wrote a note to the school very specifically that he's depressed because he's being bullied and harassed, and there's no record of any meeting with that. The doctor sent a letter saying my kid's being bullied and harassed, he's depressed, you need to do something. There's no record anything happened right then. What would the best record sites be for times where there was a complaint of some sort of incident and then nothing was done? You know, going back to the usual, these kind of cases, mom's declaration, mother's declaration. It's pretty rich. Which was introduced over objection of the district post-depositions? Yeah. I think, you know, maybe that's a little bit of a strategy. I mean, normally when someone takes a deposition of your client, you don't necessarily try and clean everything up at the deposition. You know, some lawyers do. Some lawyers like to clean them up in their own declaration. But the court admitted the declaration over their objection. And I think there's plenty. In fact, there actually was admitted. Yes. And I think the big issue is, once again, Your Honor, there's contested issues of material fact here. And if the contested issue is a material fact, it needs to go to a jury. That's what Colin Cotton said, and I think that's the issue that we have in this case. Thank you so much for having me today. Thank you very much, counsel. We have your arguments, and we appreciate.